# EXHIBIT A

| | NAME | AFFILIATION | LAST KNOWN CONTACT INFORMATION | KNOWLEDGE |
|---|---|---|---|---|
| 1 | REDACTED | Former Occupational Therapist at Life Care of Bridgeton | REDACTED | (1) Pressure placed on Life Care facilities and/or rehabilitation therapists to meet corporate ultra high and/or length of stay targets; (2) Life Care's negative treatment of employees that failed to meet ultra high and/or length of stay targets; (3) the provision of therapy that was not medically reasonable or necessary; (4) the provision of therapy that was not skilled and/or not tailored to the needs of the particular beneficiary; (5) Life Care's knowledge of whether it was billing federal health care programs for therapy that was not reasonable or necessary and/or unskilled; and (6) the assessment of patients at Life Care facilities and the preparation of MDS forms. |
| 2 | REDACTED | Former Physical Therapist at Estero | REDACTED | (1) Life Care's corporate policies and practices to maximize ultra high billings; (2) targets set by Life Care management for Life Care regions, divisions and facilities related to ultra high billings and average lengths of stay; (3) pressure placed on Life Care division and/or regional personnel to meet corporate ultra high and/or length of stay targets; (4) pressure placed on Life Care facilities and/or rehabilitation therapists to meet corporate ultra high and/or length of stay targets; and (5) the involvement, if any, of physicians in therapy decisions. |
| 3 | REDACTED | Former Certified Occupational Therapy Assistant at Life Care Center of Inverrary | REDACTED | (1) Targets set by Life Care management for Life Care regions, divisions and facilities related to ultra high billings and average lengths of stay; (2) pressure placed on Life Care facilities and/or rehabilitation therapists to meet corporate ultra high and/or length of stay targets; (3) Life Care's negative treatment of employees that failed to meet ultra high and/or length of stay targets; and (4) the involvement, if any, of physicians in therapy decisions. |
| 4 | REDACTED | Former Life Care Director of Clinical Services for Rehab | REDACTED | (1) Life Care's corporate policies and practices to maximize ultra high billings; (2) targets set by Life Care management for Life Care regions, divisions and facilities related to ultra high billings and average lengths of stay; (3) pressure placed on Life Care division and/or regional personnel to meet corporate ultra high and/or length of stay targets; and (4) the provision of therapy that was not skilled and/or not tailored to the needs of the particular beneficiary. |

| | | | | |
|---|---|---|---|---|
| 5 | REDACTED | CMS | c/o Andy Mao, U.S. Department of Justice, 601 D. St., NW, Washington, DC 20004; (202) 616-0539 | (1) Rules, regulations or CMS policies and/or procedures governing the provision of, billing for, and/or coding for rehabilitation therapy services provided at skilled nursing facilities under Medicare Part A; and (2) guidance and training provided to facilities owned or operated by Life Care related to the provision of, billing for, and/or coding for rehabilitation therapy services provided at skilled nursing facilities under Medicare Part A. |
| 6 | REDACTED | Former Life Care Regional Rehabilitation Director | REDACTED | (1) Life Care's corporate policies and practices to maximize ultra high billings; (2) targets set by Life Care management for Life Care regions, divisions and facilities related to ultra high billings and average lengths of stay; (3) pressure placed on Life Care division and/or regional personnel to meet corporate ultra high and/or length of stay targets; (4) pressure placed on Life Care facilities and/or rehabilitation therapists to meet corporate ultra high and/or length of stay targets; (5) Life Care's rewarding of facilities or employees that met or exceeded ultra high and/or length of stay targets; and (6) Life Care's negative treatment of employees that failed to meet ultra high and/or length of stay targets. |
| 7 | REDACTED | Former OTL/RSM at Life Care of Citrus County | REDACTED | (1) Targets set by Life Care management for Life Care regions, divisions and facilities related to ultra high billings and average lengths of stay; (2) pressure placed on Life Care facilities and/or rehabilitation therapists to meet corporate ultra high and/or length of stay targets; (3) Life Care's rewarding of facilities or employees that met or exceeded ultra high and/or length of stay targets; and (4) the provision of therapy that was not medically reasonable or necessary. |
| 8 | REDACTED | Former Occupational Therapist at Life Care Port Orchard | | (1) Pressure placed on Life Care facilities and/or rehabilitation therapists to meet corporate ultra high and/or length of stay targets; (2) Life Care's negative treatment of employees that failed to meet ultra high and/or length of stay targets; (3) the provision of therapy that was not medically reasonable or necessary; and (4) the provision of therapy that was not skilled and/or not tailored to the needs of the particular beneficiary. |
| 9 | REDACTED | Cahaba GBA (Cahaba) | c/o Andy Mao, U.S. Department of Justice, 601 D. St., NW, Washington, DC 20004; (202) 616-0539 | Guidance and training provided to facilities owned or operated by Life Care related to the provision of, billing for, and/or coding for rehabilitation therapy services provided at skilled nursing facilities under Medicare Part A. |

| 10 | REDACTED | Former Physical Therapist at Life Care Center at Inverrary | REDACTED | (1) Life Care's corporate policies and practices to maximize ultra high billings; (2) pressure placed on Life Care facilities and/or rehabilitation therapists to meet corporate ultra high and/or length of stay targets; (3) the provision of therapy that was not medically reasonable or necessary; and (4) the involvement, if any, of physicians in therapy decisions. |
|---|---|---|---|---|
| 11 | REDACTED | Blue Cross Blue Shield of Tennessee (BCBS) (formerly employed by Riverbend) | REDACTED | Guidance and training provided to facilities owned or operated by Life Care related to the provision of, billing for, and/or coding for rehabilitation therapy services provided at skilled nursing facilities under Medicare Part A. |
| 12 | REDACTED | Wisconsin Physician Service Insurance Corp. (WPS) | c/o Andy Mao, U.S. Department of Justice, 601 D. St., NW, Washington, DC 20004; (202) 616-0539 | Rules, regulations or TRICARE policies and/or procedures governing the provision of, billing for, and/or coding for rehabilitation therapy services provided at skilled nursing facilities to dual eligible TRICARE beneficiaries. |
| 13 | REDACTED | Former Life Care CCO & Sr. VP of Corporate Compliance (among other positions) | REDACTED | (1) Pressure placed on Life Care facilities and/or rehabilitation therapists to meet corporate ultra high and/or length of stay targets; (2) Life Care's rewarding of facilities or employees that met or exceeded ultra high and/or length of stay targets; (3) Life Care's negative treatment of employees that failed to meet ultra high and/or length of stay targets; (4) the provision of therapy that was not medically reasonable or necessary; (5) the provision of therapy that was not skilled and/or not tailored to the needs of the particular beneficiary; (6) the involvement, if any, of physicians in therapy decisions; and (7) Life Care's knowledge of whether it was billing federal health care programs for therapy that was not reasonable or necessary and/or unskilled. |
| 14 | REDACTED | Former Certified Occupational Therapy Assistant at Life Care Center at Inverrary | REDACTED | (1) Life Care's corporate policies and practices to maximize ultra high billings; (2) targets set by Life Care management for Life Care regions, divisions and facilities related to ultra high billings and average lengths of stay; (3) pressure placed on Life Care facilities and/or rehabilitation therapists to meet corporate ultra high and/or length of stay targets; (4) Life Care's negative treatment of employees that failed to meet ultra high and/or length of stay targets; (5) the provision of therapy that was not medically reasonable or necessary; and (6) the involvement, if any, of physicians in therapy decisions. |

| | | | | |
|---|---|---|---|---|
| 15 | REDACTED | Former LPTA at Life Care Center of Inverrary | REDACTED | (1) Targets set by Life Care management for Life Care regions, divisions and facilities related to ultra high billings and average lengths of stay; (2) pressure placed on Life Care facilities and/or rehabilitation therapists to meet corporate ultra high and/or length of stay targets; (3) Life Care's negative treatment of employees that failed to meet ultra high and/or length of stay targets; and (4) the provision of therapy that was not medically reasonable or necessary. |
| 16 | REDACTED | TRICARE | c/o Andy Mao, U.S. Department of Justice, 601 D. St., NW, Washington, DC 20004; (202) 616-0539 | Rules, regulations or TRICARE policies and/or procedures governing the provision of, billing for, and/or coding for rehabilitation therapy services provided at skilled nursing facilities to dual eligible TRICARE beneficiaries. |
| 17 | REDACTED | Former Speech Therapist at Life Care Center of Gwinnett | REDACTED | (1) Life Care's corporate policies and practices to maximize ultra high billings; (2) targets set by Life Care management for Life Care regions, divisions and facilities related to ultra high billings and average lengths of stay; (3) pressure placed on Life Care facilities and/or rehabilitation therapists to meet corporate ultra high and/or length of stay targets; (4) Life Care's negative treatment of employees that failed to meet ultra high and/or length of stay targets; (5) the provision of therapy that was not medically reasonable or necessary; and (6) the provision of therapy that was not skilled and/or not tailored to the needs of the particular beneficiary. |
| 18 | REDACTED | Former MDS Coordinator at Life Care Center at Inverrary | | (1) Life Care's corporate policies and practices to maximize ultra high billings; and (2) the provision of therapy that was not medically reasonable or necessary. |
| 19 | REDACTED | Former Physical Therapy Assistant at Life Care Center of Yuma | REDACTED | (1) Life Care's corporate policies and practices to maximize ultra high billings; (2) pressure placed on Life Care facilities and/or rehabilitation therapists to meet corporate ultra high and/or length of stay targets; (3) the provision of therapy that was not medically reasonable or necessary; (4) the provision of therapy that was not skilled and/or not tailored to the needs of the particular beneficiary; and (5) the involvement, if any, of physicians in therapy decisions. |

| | | | | |
|---|---|---|---|---|
| 20 | REDACTED | Former LPN / Asst. MDS Coordinator at Life Care of Orlando | REDACTED | (1) Targets set by Life Care management for Life Care regions, divisions and facilities related to ultra high billings and average lengths of stay; (2) the provision of therapy that was not medically reasonable or necessary; (3) the provision of therapy that was not skilled and/or not tailored to the needs of the particular beneficiary; (4) the involvement, if any, of physicians in therapy decisions; and (5) the assessment of patients at Life Care facilities and the preparation of MDS forms. |
| 21 | REDACTED | Former Physical Therapist at Life Care of St. Louis | REDACTED | (1) Pressure placed on Life Care facilities and/or rehabilitation therapists to meet corporate ultra high and/or length of stay targets; (2) Life Care's negative treatment of employees that failed to meet ultra high and/or length of stay targets; and (3) the provision of therapy that was not medically reasonable or necessary. |
| 22 | REDACTED | Former Rehab Service Manager at Life Care of LaCenter | REDACTED | (1) Life Care's corporate policies and practices to maximize ultra high billings; (2) targets set by Life Care management for Life Care regions, divisions and facilities related to ultra high billings and average lengths of stay; (3) pressure placed on Life Care division and/or regional personnel to meet corporate ultra high and/or length of stay targets; and (4) pressure placed on Life Care facilities and/or rehabilitation therapists to meet corporate ultra high and/or length of stay targets. |
| 23 | REDACTED | Former Rehab Director at Life Care Center of Yuma | REDACTED | (1) Targets set by Life Care management for Life Care regions, divisions and facilities related to ultra high billings and average lengths of stay; (2) pressure placed on Life Care division and/or regional personnel to meet corporate ultra high and/or length of stay targets; (3) pressure placed on Life Care facilities and/or rehabilitation therapists to meet corporate ultra high and/or length of stay targets; (4) Life Care's negative treatment of employees that failed to meet ultra high and/or length of stay targets; and (5) Life Care's knowledge of whether it was billing federal health care programs for therapy that was not reasonable or necessary and/or unskilled. |
| 24 | REDACTED | Former Occupational Therapist at Life Care of Citrus County | REDACTED | (1) Life Care's corporate policies and practices to maximize ultra high billings; and (2) the provision of therapy that was not medically reasonable or necessary. |

| | | | | |
|---|---|---|---|---|
| 25 | REDACTED | Former Life Care Vice President of Rehab Services | | (1) Life Care's corporate policies and practices to maximize ultra high billings; (2) targets set by Life Care management for Life Care regions, divisions and facilities related to ultra high billings and average lengths of stay; (3) pressure placed on Life Care division and/or regional personnel to meet corporate ultra high and/or length of stay targets; (4) pressure placed on Life Care facilities and/or rehabilitation therapists to meet corporate ultra high and/or length of stay targets; (5) Life Care's negative treatment of employees that failed to meet ultra high and/or length of stay targets; and (6) Life Care's knowledge of whether it was billing federal health care programs for therapy that was not reasonable or necessary and/or unskilled. |
| 26 | REDACTED | Former Speech Therapist at Life Care Center of Valparaiso | REDACTED | (1) Pressure placed on Life Care facilities and/or rehabilitation therapists to meet corporate ultra high and/or length of stay targets; (2) the provision of therapy that was not medically reasonable or necessary; and (3) the involvement, if any, of physicians in therapy decisions. |
| 27 | REDACTED | Former Vice President of Life Care's "Plains" region | REDACTED | (1) Life Care's corporate policies and practices to maximize ultra high billings; (2) targets set by Life Care management for Life Care regions, divisions and facilities related to ultra high billings and average lengths of stay; (3) pressure placed on Life Care division and/or regional personnel to meet corporate ultra high and/or length of stay targets; (4) pressure placed on Life Care facilities and/or rehabilitation therapists to meet corporate ultra high and/or length of stay targets; (5) Life Care's rewarding of facilities or employees that met or exceeded ultra high and/or length of stay targets; and (6) Life Care's negative treatment of employees that failed to meet ultra high and/or length of stay targets. |

| | | | | |
|---|---|---|---|---|
| 28 | REDACTED | Former Physical Therapy Assistant at Life Care of St. Louis | REDACTED | (1) Targets set by Life Care management for Life Care regions, divisions and facilities related to ultra high billings and average lengths of stay; (2) pressure placed on Life Care division and/or regional personnel to meet corporate ultra high and/or length of stay targets; (3) pressure placed on Life Care facilities and/or rehabilitation therapists to meet corporate ultra high and/or length of stay targets; (4) the provision of therapy that was not medically reasonable or necessary; and (5) the provision of therapy that was not skilled and/or not tailored to the needs of the particular beneficiary. |
| 29 | REDACTED | Former Executive Director & Regional Vice President at Life Care of Lake Forrest | REDACTED | (1) Targets set by Life Care management for Life Care regions, divisions and facilities related to ultra high billings and average lengths of stay; (2) pressure placed on Life Care division and/or regional personnel to meet corporate ultra high and/or length of stay targets; (3) pressure placed on Life Care facilities and/or rehabilitation therapists to meet corporate ultra high and/or length of stay targets; (4) Life Care's rewarding of facilities or employees that met or exceeded ultra high and/or length of stay targets; and (5) Life Care's negative treatment of employees that failed to meet ultra high and/or length of stay targets. |
| 30 | REDACTED | Former Occupational Therapist at Heritage Center Nursing Home | REDACTED | (1) Pressure placed on Life Care facilities and/or rehabilitation therapists to meet corporate ultra high and/or length of stay targets; (2) the provision of therapy that was not medically reasonable or necessary; (3) the provision of therapy that was not skilled and/or not tailored to the needs of the particular beneficiary; and (4) the involvement, if any, of physicians in therapy decisions. |
| 31 | REDACTED | Former Physical Therapist at Life Care Puyallup | REDACTED | (1) Targets set by Life Care management for Life Care regions, divisions and facilities related to ultra high billings and average lengths of stay; (2) pressure placed on Life Care facilities and/or rehabilitation therapists to meet corporate ultra high and/or length of stay targets; (3) the provision of therapy that was not medically reasonable or necessary; and (4) the provision of therapy that was not skilled and/or not tailored to the needs of the particular beneficiary. |
| 32 | REDACTED | CMS | c/o Andy Mao, U.S. Department of Justice, 601 D. St., NW, Washington, DC 20004; (202) 616-0539 | Rules, regulations or CMS policies and/or procedures governing the provision of, billing for, and/or coding for rehabilitation therapy services provided at skilled nursing facilities under Medicare Part A. |

| | | | | |
|---|---|---|---|---|
| 33 | REDACTED | Former Occupational Therapist at Life Care of Bridgeton | REDACTED | (1) Life Care's corporate policies and practices to maximize ultra high billings; (2) targets set by Life Care management for Life Care regions, divisions and facilities related to ultra high billings and average lengths of stay; (3) pressure placed on Life Care division and/or regional personnel to meet corporate ultra high and/or length of stay targets; (4) pressure placed on Life Care facilities and/or rehabilitation therapists to meet corporate ultra high and/or length of stay targets; (5) the provision of therapy that was not medically reasonable or necessary; and (6) the provision of therapy that was not skilled and/or not tailored to the needs of the particular beneficiary. |
| 34 | REDACTED | CMS (former) | c/o Andy Mao, U.S. Department of Justice, 601 D. St., NW, Washington, DC 20004; (202) 616-0539 | (1) Rules, regulations or CMS policies and/or procedures governing the provision of, billing for, and/or coding for rehabilitation therapy services provided at skilled nursing facilities under Medicare Part A; and (2) guidance and training provided to facilities owned or operated by Life Care related to the provision of, billing for, and/or coding for rehabilitation therapy services provided at skilled nursing facilities under Medicare Part A. |
| 35 | REDACTED | Former Occupational Therapist at Hilo | REDACTED | (1) Targets set by Life Care management for Life Care regions, divisions and facilities related to ultra high billings and average lengths of stay; (2) pressure placed on Life Care facilities and/or rehabilitation therapists to meet corporate ultra high and/or length of stay targets; (3) Life Care's negative treatment of employees that failed to meet ultra high and/or length of stay targets; (4) the provision of therapy that was not medically reasonable or necessary; and (5) the provision of therapy that was not skilled and/or not tailored to the needs of the particular beneficiary. |
| 36 | REDACTED | Former Physical Therapy Assistant at Life Care Center of Collegedale | REDACTED | (1) Life Care's corporate policies and practices to maximize ultra high billings; and (2) pressure placed on Life Care facilities and/or rehabilitation therapists to meet corporate ultra high and/or length of stay targets. |

| | | | | |
|---|---|---|---|---|
| 37 | REDACTED | Former Life Care Divisional Rehab Director | REDACTED | (1) Life Care's corporate policies and practices to maximize ultra high billings; (2) targets set by Life Care management for Life Care regions, divisions and facilities related to ultra high billings and average lengths of stay; (3) pressure placed on Life Care division and/or regional personnel to meet corporate ultra high and/or length of stay targets; (4) pressure placed on Life Care facilities and/or rehabilitation therapists to meet corporate ultra high and/or length of stay targets; (5) Life Care's rewarding of facilities or employees that met or exceeded ultra high and/or length of stay targets; (6) Life Care's negative treatment of employees that failed to meet ultra high and/or length of stay targets; (7) the provision of therapy that was not medically reasonable or necessary; and (8) the provision of therapy that was not skilled and/or not tailored to the needs of the particular beneficiary. |
| 38 | REDACTED | Former MDS Coordinator at Life Care of St. Louis | REDACTED | (1) Pressure placed on Life Care division and/or regional personnel to meet corporate ultra high and/or length of stay targets; (2) pressure placed on Life Care facilities and/or rehabilitation therapists to meet corporate ultra high and/or length of stay targets; (3) Life Care's rewarding of facilities or employees that met or exceeded ultra high and/or length of stay targets; (4) Life Care's negative treatment of employees that failed to meet ultra high and/or length of stay targets; (5) the provision of therapy that was not medically reasonable or necessary; (6) the provision of therapy that was not skilled and/or not tailored to the needs of the particular beneficiary; (7) the involvement, if any, of physicians in therapy decisions; and (8) the assessment of patients at Life Care facilities and the preparation of MDS forms. |
| 39 | Glenda Martin | Relator | c/o Mark Simpson, Simpson Law Firm LLC, 165 North Main St., Jonesboro, GA 30236; (770) 371-5008 | (1) Pressure placed on rehabilitation therapists to meet corporate ultra high and/or length of stay targets at Life Care facilities; (2) Life Care's treatment of employees that failed to meet ultra high and/or length of stay targets; (3) the provision of therapy that was not medically reasonable or necessary and/or not skilled or tailored to the needs of the particular beneficiary at facilities owned or operated by Life Care; and (4) the involvement, if any, of physicians in therapy decisions at facilities owned or operated by Life Care. |

| | | | | |
|---|---|---|---|---|
| 40 | REDACTED | Former Rehab Director at Life Care Paradise Valley | | (1) Life Care's corporate policies and practices to maximize ultra high billings; (2) targets set by Life Care management for Life Care regions, divisions and facilities related to ultra high billings and average lengths of stay; (3) pressure placed on Life Care division and/or regional personnel to meet corporate ultra high and/or length of stay targets; and (4) pressure placed on Life Care facilities and/or rehabilitation therapists to meet corporate ultra high and/or length of stay targets. |
| 41 | REDACTED | Former Occupational Therapist at Life Care Center at Inverrary | | (1) Life Care's corporate policies and practices to maximize ultra high billings; (2) targets set by Life Care management for Life Care regions, divisions and facilities related to ultra high billings and average lengths of stay; (3) pressure placed on Life Care facilities and/or rehabilitation therapists to meet corporate ultra high and/or length of stay targets; (4) Life Care's negative treatment of employees that failed to meet ultra high and/or length of stay targets; (5) the provision of therapy that was not medically reasonable or necessary; and (6) the provision of therapy that was not skilled and/or not tailored to the needs of the particular beneficiary. |
| 42 | REDACTED | Former Rehabilitation Service Manager at Life Care of St. Louis | REDACTED | (1) Targets set by Life Care management for Life Care regions, divisions and facilities related to ultra high billings and average lengths of stay; (2) pressure placed on Life Care division and/or regional personnel to meet corporate ultra high and/or length of stay targets; (3) pressure placed on Life Care facilities and/or rehabilitation therapists to meet corporate ultra high and/or length of stay targets; (4) Life Care's negative treatment of employees that failed to meet ultra high and/or length of stay targets; (5) the provision of therapy that was not medically reasonable or necessary; and (6) the provision of therapy that was not skilled and/or not tailored to the needs of the particular beneficiary. |

| 43 | REDACTED | Former Speech Language Pathologist at Life Care Center of Gwinnett | REDACTED | (1) Life Care's corporate policies and practices to maximize ultra high billings; (2) pressure placed on Life Care facilities and/or rehabilitation therapists to meet corporate ultra high and/or length of stay targets; (3) Life Care's negative treatment of employees that failed to meet ultra high and/or length of stay targets; (4) the provision of therapy that was not medically reasonable or necessary; and (5) the provision of therapy that was not skilled and/or not tailored to the needs of the particular beneficiary. |
|---|---|---|---|---|
| 44 | REDACTED | Life Care's former Chief Operating Officer | REDACTED | (1) Life Care's corporate policies and practices to maximize ultra high billings; (2) targets set by Life Care management related to ultra high billings and average lengths of stay; (3) pressure placed on Life Care employees and facilities to meet corporate ultra high and/or length of stay targets; (4) Life Care's provision of therapy that was not medically reasonable or necessary and/or not skilled or not tailored to the needs of the particular beneficiary; and (5) Life Care's knowledge of whether it was billing federal health care programs for therapy that was not reasonable or necessary and/or unskilled. |
| 45 | REDACTED | Former Executive Director at Life Care of Inverrary | REDACTED | (1) Life Care's corporate policies and practices to maximize ultra high billings; (2) targets set by Life Care management for Life Care regions, divisions and facilities related to ultra high billings and average lengths of stay; (3) pressure placed on Life Care division and/or regional personnel to meet corporate ultra high and/or length of stay targets; (4) pressure placed on Life Care facilities and/or rehabilitation therapists to meet corporate ultra high and/or length of stay targets; and (5) Life Care's rewarding of facilities or employees that met or exceeded ultra high and/or length of stay targets. |

| | | | | |
|---|---|---|---|---|
| 46 | REDACTED | Former Physical Therapy Assistant at Life Care Center of Collegedale | REDACTED | (1) Life Care's corporate policies and practices to maximize ultra high billings; (2) pressure placed on Life Care facilities and/or rehabilitation therapists to meet corporate ultra high and/or length of stay targets; (3) Life Care's rewarding of facilities or employees that met or exceeded ultra high and/or length of stay targets; (4) Life Care's negative treatment of employees that failed to meet ultra high and/or length of stay targets; (5) the provision of therapy that was not medically reasonable or necessary; and (6) the provision of therapy that was not skilled and/or not tailored to the needs of the particular beneficiary. |
| 47 | REDACTED | Former Vice President of Operations of Life Care at Home | REDACTED | Life Care's corporate policies and practices to maximize ultra high billings. |
| 48 | REDACTED | Former contract PT with Supplemental Health Care, who provided PT at Life Care Centers of Puyullap and Aubur | REDACTED | (1) Targets set by Life Care management for Life Care regions, divisions and facilities related to ultra high billings and average lengths of stay; (2) pressure placed on Life Care facilities and/or rehabilitation therapists to meet corporate ultra high and/or length of stay targets; (3) the provision of therapy that was not medically reasonable or necessary; (4) the provision of therapy that was not skilled and/or not tailored to the needs of the particular beneficiary; and (5) Life Care's knowledge of whether it was billing federal health care programs for therapy that was not reasonable or necessary and/or unskilled. |
| 49 | REDACTED | Life Care's founder, sole shareholder, and Chairman of the Board | c/o Scot Hasselman, Reed Smith LLP, 1301 K. St., NW #1100, Washington, DC 20005; (202) 414-9200 | (1) Life Care's corporate policies and practices to maximize ultra high billings; (2) targets set by Life Care management related to ultra high billings and average lengths of stay; (3) pressure placed on Life Care employees and facilities to meet corporate ultra high and/or length of stay targets; (4) Life Care's provision of therapy that was not medically reasonable or necessary and/or not skilled or not tailored to the needs of the particular beneficiary; and (5) Life Care's knowledge of whether it was billing federal health care programs for therapy that was not reasonable or necessary and/or unskilled. |

| | | | | |
|---|---|---|---|---|
| 50 | REDACTED | Former Life Care Senior Vice President of Integrity and Compliance | REDACTED | (1) Life Care's compliance and complaint handling function; (2) pressure placed on Life Care division and/or regional personnel, and/or Life Care facilities and/or rehabilitation therapists, to meet corporate ultra high and/or length of stay targets; and (3) Life Care's knowledge of whether it was billing federal health care programs for therapy that was not reasonable or necessary and/or unskilled. |
| 51 | REDACTED | Former RN/MDS Coordinator at Life Care Center at Inverrary | REDACTED | (1) Pressure placed on Life Care facilities and/or rehabilitation therapists to meet corporate ultra high and/or length of stay targets; and (2) the assessment of patients at Life Care facilities and the preparation of MDS forms. |
| 52 | REDACTED | Life Care's Senior Vice President of Rehabilitation Services | c/o Scot Hasselman, Reed Smith LLP, 1301 K. St., NW #1100, Washington, DC 20005; (202) 414-9200 | (1) Life Care's corporate policies and practices to maximize ultra high billings; (2) targets set by Life Care management related to ultra high billings and average lengths of stay; (3) pressure placed on Life Care employees and facilities to meet corporate ultra high and/or length of stay targets; (4) Life Care's provision of therapy that was not medically reasonable or necessary and/or not skilled or not tailored to the needs of the particular beneficiary; and (5) Life Care's knowledge of whether it was billing federal health care programs for therapy that was not reasonable or necessary and/or unskilled. |
| 53 | REDACTED | Former Physical Therapist at Life Care Center of Yuma | REDACTED | (1) Life Care's corporate policies and practices to maximize ultra high billings; (2) targets set by Life Care management for Life Care regions, divisions and facilities related to ultra high billings and average lengths of stay; (3) pressure placed on Life Care facilities and/or rehabilitation therapists to meet corporate ultra high and/or length of stay targets; (4) Life Care's negative treatment of employees that failed to meet ultra high and/or length of stay targets; (5) the provision of therapy that was not medically reasonable or necessary; and (6) the provision of therapy that was not skilled and/or not tailored to the needs of the particular beneficiary. |
| 54 | REDACTED | Former Physical Therapist at Life Care Center at Inverrary | REDACTED | (1) Targets set by Life Care management for Life Care regions, divisions and facilities related to ultra high billings and average lengths of stay; and (2) the provision of therapy that was not medically reasonable or necessary. |

| | | | | |
|---|---|---|---|---|
| 55 | REDACTED | Former Occupational Therapist / Contract Therapist at Life Care Center of Yuma | REDACTED | (1) Life Care's corporate policies and practices to maximize ultra high billings; (2) pressure placed on Life Care facilities and/or rehabilitation therapists to meet corporate ultra high and/or length of stay targets; (3) the provision of therapy that was not medically reasonable or necessary; and (4) the provision of therapy that was not skilled and/or not tailored to the needs of the particular beneficiary. |
| 56 | REDACTED | Former Occupational Therapist at Life Care of Citrus County | REDACTED | (1) Life Care's corporate policies and practices to maximize ultra high billings; (2) pressure placed on Life Care facilities and/or rehabilitation therapists to meet corporate ultra high and/or length of stay targets; (3) Life Care's negative treatment of employees that failed to meet ultra high and/or length of stay targets; (4) the provision of therapy that was not medically reasonable or necessary; and (5) the provision of therapy that was not skilled and/or not tailored to the needs of the particular beneficiary. |
| 57 | Tammy Taylor | Relator | c/o Anthony Vitale The Health Law Offices of Anthony C. Vitale, P.A. 2333 Brickell Ave., Suite A-1, Miami, FL 33129; (305) 358-4500 | (1) Life Care's corporate policies and practices to maximize ultra high billings; (2) targets set by Life Care management for Life Care regions, divisions and facilities related to ultra high billings and average lengths of stay; (3) pressure placed on Life Care facilities and/or rehabilitation therapists to meet corporate ultra high and/or length of stay targets; (4) Life Care's negative treatment of employees that failed to meet ultra high and/or length of stay targets; (5) the provision of therapy that was not skilled and/or not tailored to the needs of the particular beneficiary; (6) the involvement, if any, of physicians in therapy decisions; (7) Life Care's knowledge of whether it was billing federal health care programs for therapy that was not reasonable or necessary and/or unskilled; and (8) the assessment of patients at Life Care facilities and the preparation of MDS forms. |
| 58 | REDACTED | Speech therapist at Life Care of Plymouth, Oaks at New Bedford, and Life Care of Raynham | REDACTED | (1) Life Care's corporate policies and practices to maximize ultra high billings; (2) targets set by Life Care management for Life Care regions, divisions and facilities related to ultra high billings and average lengths of stay; (3) pressure placed on Life Care facilities and/or rehabilitation therapists to meet corporate ultra high and/or length of stay targets; (4) the provision of therapy that was not medically reasonable or necessary; and (5) the provision of therapy that was not skilled and/or not tailored to the needs of the particular beneficiary. |

| | | | | |
|---|---|---|---|---|
| 59 | REDACTED | Former OTA/PRN at Life Care of Citrus County | REDACTED | (1) Life Care's corporate policies and practices to maximize ultra high billings; (2) targets set by Life Care management for Life Care regions, divisions and facilities related to ultra high billings and average lengths of stay; (3) pressure placed on Life Care division and/or regional personnel to meet corporate ultra high and/or length of stay targets; (4) pressure placed on Life Care facilities and/or rehabilitation therapists to meet corporate ultra high and/or length of stay targets; (5) the provision of therapy that was not medically reasonable or necessary; (6) the provision of therapy that was not skilled and/or not tailored to the needs of the particular beneficiary; and (7) Life Care's knowledge of whether it was billing federal health care programs for therapy that was not reasonable or necessary and/or unskilled. |
| 60 | REDACTED | CMS | c/o Andy Mao, U.S. Department of Justice, 601 D. St., NW, Washington, DC 20004; (202) 616-0539 | Rules, regulations or CMS policies and/or procedures governing the provision of, billing for, and/or coding for rehabilitation therapy services provided at skilled nursing facilities under Medicare Part A. |
| 61 | REDACTED | Former Physical Therapist at Life Care Charleston | REDACTED | (1) Life Care's corporate policies and practices to maximize ultra high billings; (2) pressure placed on Life Care facilities and/or rehabilitation therapists to meet corporate ultra high and/or length of stay targets; (3) the provision of therapy that was not medically reasonable or necessary; and (4) the provision of therapy that was not skilled and/or not tailored to the needs of the particular beneficiary. |
| 62 | REDACTED | Former Physical Therapist at Life Care Center of Collegedale | REDACTED | (1) Life Care's corporate policies and practices to maximize ultra high billings; (2) pressure placed on Life Care division and/or regional personnel to meet corporate ultra high and/or length of stay targets; (3) pressure placed on Life Care facilities and/or rehabilitation therapists to meet corporate ultra high and/or length of stay targets; (4) Life Care's rewarding of facilities or employees that met or exceeded ultra high and/or length of stay targets; (5) Life Care's negative treatment of employees that failed to meet ultra high and/or length of stay targets; (6) the provision of therapy that was not medically reasonable or necessary; and (7) the provision of therapy that was not skilled and/or not tailored to the needs of the particular beneficiary. |

| | | | | |
|---|---|---|---|---|
| 63 | REDACTED | Former Life Care Regional Rehab Manager then Divisional Rehab Manager | REDACTED | (1) Life Care's corporate policies and practices to maximize ultra high billings; (2) targets set by Life Care management for Life Care regions, divisions and facilities related to ultra high billings and average lengths of stay; (3) pressure placed on Life Care division and/or regional personnel to meet corporate ultra high and/or length of stay targets; (4) pressure placed on Life Care facilities and/or rehabilitation therapists to meet corporate ultra high and/or length of stay targets; and (5) Life Care's negative treatment of employees that failed to meet ultra high and/or length of stay targets. |
| 64 | REDACTED | Former Life Care Executive Vice President of Rehab | REDACTED | (1) Life Care's corporate policies and practices to maximize ultra high billings; (2) targets set by Life Care management for Life Care regions, divisions and facilities related to ultra high billings and average lengths of stay; (3) pressure placed on Life Care division and/or regional personnel to meet corporate ultra high and/or length of stay targets; (4) Life Care's rewarding of facilities or employees that met or exceeded ultra high and/or length of stay targets; (5) Life Care's negative treatment of employees that failed to meet ultra high and/or length of stay targets; and (6) Life Care's knowledge of whether it was billing federal health care programs for therapy that was not reasonable or necessary and/or unskilled. |
| 65 | REDACTED | Former Physical Therapy Assistant at Life Care at Copper Basin | | (1) Life Care's corporate policies and practices to maximize ultra high billings; (2) pressure placed on Life Care facilities and/or rehabilitation therapists to meet corporate ultra high and/or length of stay targets; (3) Life Care's negative treatment of employees that failed to meet ultra high and/or length of stay targets; (4) the provision of therapy that was not medically reasonable or necessary; and (5) the provision of therapy that was not skilled and/or not tailored to the needs of the particular beneficiary. |

| 66 | REDACTED | Former Rehabilitation Service Manager at Life Care Center at Inverrary | | (1) Life Care's corporate policies and practices to maximize ultra high billings; (2) targets set by Life Care management for Life Care regions, divisions and facilities related to ultra high billings and average lengths of stay; (3) pressure placed on Life Care division and/or regional personnel to meet corporate ultra high and/or length of stay targets; (4) pressure placed on Life Care facilities and/or rehabilitation therapists to meet corporate ultra high and/or length of stay targets; (5) the involvement, if any, of physicians in therapy decisions; and (6) the assessment of patients at Life Care facilities and the preparation of MDS forms. |